UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
HOZIE ROWELL,

                                     **SECOND AMENDED COMPLAINT**

                                     **16 cv 6598 (AJN)**

                                     **ECF Case**

            Plaintiff,

       vs.

The CITY OF NEW YORK,
NEW YORK CITY POLICE OFFICERS
JOAN FERREIRA, SERGEANT SHANE KILLILEA,
and LIEUTENANT CHRISTOPHER POPOVIC,     **JURY TRIAL DEMANDED**
in their individual and official capacities,

                 Defendants.
---------------------------------------------------------------x

Plaintiff Hozie Rowell, by his attorney, Cyrus Joubin, complaining of the Defendants,

respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.   This civil rights action arises from the illegal search, false arrest, and malicious

prosecution of Hozie Rowell ("Plaintiff"), when a team of NYPD officers illegally raided

Plaintiff's apartment and, finding nothing unlawful, fabricated evidence against Plaintiff

to justify their illegal intrusion.  Plaintiff asserts constitutional claims pursuant to 42

U.S.C. § 1983 ("Section 1983") against the individual defendants for First Amendment

retaliation, false arrest and imprisonment, illegal search, malicious prosecution, and

failure to intervene, and a *Monell* claim against the City of New York for the same

constitutional violations.  Additionally, Plaintiff asserts analogous claims under New

York Law against the individual defendants, and against the City of New York under the

doctrine of *respondeat superior*.  Plaintiff seeks compensatory and punitive damages, costs, disbursements, and attorney's fees pursuant to applicable state and federal civil rights law.

### JURISDICTION

2.   This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the First and Fourth Amendment to the United States Constitution.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

3.   Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy which gives rise to the federally based claims and causes of action.

### VENUE

4.   Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district.

### JURY DEMAND

5.   Plaintiff respectfully demands a trial by jury on each and every one of his claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

### PARTIES

6.    Plaintiff Hozie Rowell is a fifty-seven-year-old African-American man, a United States citizen, and a resident of Manhattan.

7.     The individually named defendants Police Officer Joan Ferreira (Shield # 7431) ("PO Ferreira"), Sergeant Shane Killilea (Shield # 3372) ("Sgt. Killilea"), and Lieutenant Christopher Popovic (Tax ID # 920717) ("Lt. Popovic") (collectively, the "individual defendants") are and were at all times relevant herein officers, employees and agents of the New York City Police Department ("NYPD").

8.     On the date of the incident giving rise to this complaint, the individual defendants were assigned to the Housing Bureau PSA 5.

9.     Each individual defendant is sued in his individual and official capacity.  At all times mentioned herein, each individual defendant acted under the color of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

10.    Defendant City is a municipality created and authorized under the laws of New York State.  It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

**<u>NOTICE OF CLAIM</u>**

11.    Plaintiff served a Notice of Claim on the Comptroller of the City of New York within ninety days of the incident, being assigned Claim # 2016PI011728.  At least 90 days have elapsed since the service of the Notice of Claim, and adjustment and payment has been neglected or refused.

12.    The City of New York failed to demand a hearing pursuant to General Municipal Law § 50-h.

13.    This action has been commenced within one year and ninety days after the occurrence of the event upon which the claims are based.

## STATEMENT OF FACTS

**The Apartment**

14.     Plaintiff and his wife Theresa Rowell ("Ms. Rowell") have lived together in their three-bedroom apartment (the "Apartment") on the fourth floor of 2070 3rd Avenue, in Harlem, New York City, for about twenty years.

15.     Also living in the Apartment are Ms. Rowell's granddaughters, Nikke Wright ("Nikke") and Shaara Wright ("Shaara"), who have their own bedrooms.

16.     The Apartment building is in the James Weldon Johnson Houses, a housing community controlled by the New York City Housing Authority ("NYCHA").

17.     The Apartment is a drug-free, weapon-free, contraband-free haven for the Rowell family.

18.     In the twenty years that Plaintiff and Ms. Rowell have been living in the Apartment, there has been no illicit drug activity of any kind inside the Apartment or associated with the Apartment.

**Community Activism**

19.     Plaintiff and Ms. Rowell are active and vocal members of their community, fighting to clean their building of drug activity, their local police precinct of unethical police officers, and their neighborhood of corrupt leaders.

20.     The Precinct in charge of fighting crime in Plaintiff's Apartment building is the Housing Police Service Area 5 ("PSA 5").

21.     Plaintiff has often provided helpful and valuable information to the NYPD regarding criminal activity in his building.

22.     Plaintiff has also made complaints against rogue and abusive police officers in his neighborhood, resulting in disciplinary consequences for some of those officers.

23.     Plaintiff and Ms. Rowell have also publicly denounced Ethel Velez, the head of the James Weldon Johnson Houses Resident Association, a woman of power and influence in the community who has extensive contacts in the local NYPD precincts.

**Illegal Search Warrant**

24.     Because of Plaintiff's complaints against police officers and local leaders, Plaintiff developed a reputation within the PSA 5 as a pest, a gadfly who needed to be silenced and gotten rid of.

25.     To silence and get rid of Plaintiff, PO Ferreira and Sgt. Killilea spearheaded an effort to raid Plaintiff's home, arrest him, and initiate a baseless prosecution against him.

26.     The first step of this effort was obtaining a search warrant, and to this end, PO Ferreira falsely swore to an affidavit (the "Affidavit") in support of a search warrant targeting Plaintiff and his Apartment.

27.     The Affidavit falsely claimed that a confidential informant (the "CI") made several drug transactions with Plaintiff at the Apartment, and that Sgt. Killilea confirmed these transactions.

28.     Both PO Ferreira and Sgt. Killilea knew the CI had never made any drug transactions with Plaintiff and knew that Plaintiff's Apartment was not involved in any drug activity.

29.     PO Ferreira and Sgt. Killilea together invented the factual basis of the Affidavit, using a drug-abusing, criminally-inclined, disposable CI as the phony source of this information.

30.     PO Ferreira and Sgt. Killilea submitted the false Affidavit to the New York County District Attorney's Office, Special Narcotics Division, specifically to Assistant District Attorney Daniel Haier ("ADA Haier").

31.     ADA Haier then sought a search warrant to be issued by a criminal court judge.

32.     On the basis of the mendacious Affidavit, Judge Richard Weinberg of New York County Criminal Court approved and issued a search warrant (the "Search Warrant") on May 30, 2014, authorizing a search of the Apartment and Plaintiff.

**The Military-style Execution of the Search Warrant**

33.     In the early morning hours of June 5, 2014, around 5:30 a.m., Plaintiff was awoken in his Apartment by the sound of Ms. Rowell's worried voice in the kitchen, shouting "They're breaking in!"

34.     The Apartment door was suddenly busted open with a battering ram, and a group of about fifteen NYPD officers – including the individual defendants – charged into the Apartment, some dressed in riot gear and armed with assault rifles, others in NYPD uniform, and others in plain clothes.

35.     The officers in riot gear, who entered first, pointed their assault rifles at Ms. Rowell and pushed her into the kitchen where she was forced to lie down on the floor.

36.     Plaintiff, who had gotten out of bed naked when he heard his wife's worried voice, was ordered to get on the ground by an officer in riot gear who pointed an assault rifle at him.

37.     Frightened for his life, Plaintiff immediately complied and lay down on the ground, remaining there, naked, with the assault rifle pointed at him and other officers surrounding him.

38.     Meanwhile, the officers in riot gear kicked and smashed open the doors of Shaara and Nikke's bedrooms.

39.     Plaintiff heard Shaara, who was unclothed, call out, "Grandpa, what's wrong?" and "They have a gun in my back!"

40.     Ms. Rowell, who was wearing only her bra and underwear, pleaded with the officers to be allowed to wear clothes, saying "I'm not dressed, I'm Muslim!"

41.     Plaintiff, a devout Muslim man, asked to have his naked body covered and shielded from the view of the officers and his granddaughters.

42.     Stuck to the ground with the tip of an assault rifle pressed into his body, hearing his wife and granddaughters screaming, Plaintiff was so shocked, helpless, and frightened for his family's safety that he began crying.

43.     Sgt. Killilea, wearing his NYPD uniform, approached Plaintiff, showed him a paper with Plaintiff's name, and asked Plaintiff if he was Hozie Rowell.

44.     When Plaintiff replied in the affirmative, Sgt. Killilea said he had a warrant to search the Apartment.

45.     Throughout the Apartment came the sounds of banging and crashing as the officers flipped furniture, upended beds, tossed drawers, rummaged through closets,

thoroughly searching all nooks and containers in the Apartment, breaking property as they did so.

46.    After about ten minutes of lying naked on the floor, Plaintiff was finally allowed to cover his body with clothing and was placed on the living room sofa.

47.    When Plaintiff asked why the Apartment was being raided, Sgt. Killilea responded, "You made a sale at your door."

48.    Completely innocent of such a deed, Plaintiff scoffed at this assertion, denying it, and asked for more details, but nobody told him anything further.

49.    Plaintiff was eventually escorted out of the Apartment and into a NYPD van parked outside his Apartment building.

50.    Meanwhile, in the Apartment, Ms. Rowell, Shaara, and Nikke were all detained and handcuffed, terrified and confused.

51.    The officers, including PO Ferreira and Sgt. Killilea, continued to thoroughly scour the Apartment, but they found absolutely nothing unlawful and no evidence of illegal activity.

52.    The lack of evidence inside the Apartment exposed the raid for what it really was – a sham, a baseless intrusion, a mistake, a complete disgrace.

53.    To conceal this truth, Sgt. Killilea and PO Ferreira sought to cover up their terrible policing by manufacturing evidence.

54.    Sgt. Killilea left the Apartment – along with two other officers – and walked out the building, got into his unmarked car, and drove off.

55.    About fifteen minutes later, Sgt. Killilea returned, walked into the building, re-entered the Apartment, and went straight to Plaintiff's bedroom.

56.    Then – poof! – Sgt. Killilea announced that he found cocaine in plain view on top of Plaintiff's dresser.

57.    This was surprising news to all the officers who had thoroughly searched Plaintiff's bedroom but saw nothing illegal, suspicious, or wrongful.

58.    It was obvious to all officers searching the Apartment, particularly those who had searched Plaintiff's bedroom, that Sgt. Killilea was lying about the discovery of cocaine but none of these officers dared to challenge the discovery or voice their knowledge about the mendacious nature of the discovery.

59.    The officers who searched Plaintiff's bedroom observed another manner in which evidence was distorted and manipulated.

60.    Inside a dresser drawer in Plaintiff's bedroom, Plaintiff stored jewelry that he sold with his family – jewelry which was sold in small ziplock bags.

61.    When the officers searching the Apartment opened the top dresser drawer in Plaintiff's bedroom, they found this jewelry along with ziplock bags.  It was clear that the ziplock bags, many of which contained the jewelry, were used for the purpose of packaging jewelry.

62.    But the individual defendants divorced the ziplock bags from their context and seized the bags as evidence of drug-dealing, deliberately failing to account for or document the jewelry contained in the bags.

63.    Also during the search of Plaintiff's Apartment, the officers stole valuable items that had nothing to do with their investigation, including valuable belt buckles and model motorcycles.

**False Arrest**

64.    After Sgt. Killilea planted cocaine in Plaintiff's bedroom, he left the building and got back into his unmarked police car.

65.    As Sgt. Killilea drove off, the van containing Plaintiff followed and soon arrived at the PSA 5 Precinct (the "Precinct").

66.    At the Precinct, Plaintiff was booked and processed, fingerprinted and photographed, searched and detained in a holding cell.

67.    Plaintiff was then transported to Central Booking at 100 Centre Street, in lower Manhattan, where he was detained in holding cells for about twenty hours.

**Malicious Prosecution**

68.    On June 6, 2014, Plaintiff was arraigned in New York County Criminal Court on Docket Number 2014NY042680, charged with the misdemeanors of Criminally using drug paraphernalia in the second degree under NY Penal Law 220.50(2), and Criminal Possession of a Controlled Substance in the seventh degree under NY Penal Law 220.03.

69.    The Criminal Court Complaint (the "Complaint") was based on the false allegations and concocted observations of PO Ferreira and Sgt. Killilea.

70.    In the Complaint, Sgt. Killilea falsely claimed that upon executing a search warrant in the Apartment on June 5, 2014, he "observed two tinfoils [sic] packages containing crack/cocaine in plain view" and "found one glassine envelope containing cocaine" as well as "118 smaller empty ziplock bags."

71.    On the basis of the false allegations in the Complaint, the Judge at Plaintiff's arraignment set bail, which Plaintiff's family could not immediately afford.

72.    Accordingly, Plaintiff was detained and transported to Rikers Island Correctional Center.

73.     After five days at Rikers Island, during which Plaintiff became very sick, Plaintiff's family paid his bail and Plaintiff was released.

74.     Because of the prosecution against him, Plaintiff was ordered to appear in New York County Criminal Court numerous times over the course of a year and a half.

75.     During Plaintiff's prosecution, because the individual defendants reported the false allegations of drug activity to NYCHA, Plaintiff and his family faced the threat of eviction from the Apartment.

76.     On January 21, 2016, the prosecution was dismissed on speedy trial grounds.

77.     After the dismissal of the criminal charges, the threat of eviction was also terminated.

78.     The stolen goods from the Apartment were never returned.

79.     Plaintiff never received compensation for the items that were broken during the raid.

**NYPD's Culture of Mendacity**

80.     The NYPD failed to supervise and discipline the individual defendants despite their histories of malicious and mendacious behavior, ignoring the risk that they would engage in future misconduct, thereby encouraging them to continue to abuse their powers and violate the rights of civilians.

81.      There is a systemic failure by the City to identify, discipline, and supervise NYPD officers who fabricate criminal charges, a failure so widespread, obvious, and tolerated as to constitute a custom and policy of Defendant City.

82.     The NYPD's flaccid response to lying officers – particularly in the context of filing false charges – constitutes an irrational and destructive custom and policy that fosters a culture of mendacity in the NYPD.

83.     The City has recognized the obvious and significant problem of police officers fabricating criminal charges, but there is no serious mechanism in place by which to weed out dishonest officers, even when their mendacious behavior abrogates the constitutional rights of citizens.

84.     Proportionate and appropriate discipline sends a message to NYPD officers that they are not above the law and are accountable to the people whom they serve.  But NYPD officers usually face only minor discipline or no discipline whatsoever for making false statement on court documents.

85.     The Civilian Complaint Review Board ("CCRB") has no jurisdiction to investigate allegations of fabricated statements by NYPD officers in criminal court documents.  Investigating, controlling, and punishing this type of wrongdoing is the responsibility of the NYPD.

86.     In 1995, by Executive Order No. 18, Defendant City's Mayor created the Commission to Combat Police Corruption (the "Commission") to monitor and evaluate the NYPD's anti-corruption activities.  The Commission fulfills its mandate to monitor the NYPD's performance by reviewing the investigations of the Internal Affairs Bureau ("IAB"), and presenting its findings in its Annual Report.

87.     Since its inception, the Commission has emphasized the importance of appropriately disciplining officers who make false statements.  On the basis of the Commission's recommendations, the NYPD has adopted a False Statement Policy (*see* NYPD Patrol Guide Section 203-08) that mandates termination of officers who intentionally make false official statements regarding a material matter, unless exceptional circumstances exist.

88.     As the Commission stated in its 2013 Annual Report, "Consistent application of

the false statement policy is of utmost importance.  It not only enables members of the service to know what they can expect if they make false statements, but it also sends a clear message to members of the service, as well as the public, that the Department will not tolerate such conduct" (pg. 74).

89.     The Commission analyzes false statements in official criminal court documents, including supporting depositions, criminal court complaints, summonses, and affidavits. False statements in such documents are of paramount importance because they have the potential to unjustly deprive citizens of their liberty and to destroy the lives of innocent people.

90.     Despite the importance of appropriately identifying and punishing officers who make false statements, the NYPD rarely imposes discipline consistent with its stated policy of terminating officers.  Indeed, the gap between its practice and policy is so wide as to make the NYPD's False Statement Policy a sham.

91.     For example, in the 2014 Annual Report, the Commission examined ten cases involving false statements in sworn court documents; in seven of those cases, the subject officers were found guilty but not separated from the police department.  Such findings – which expose the gap between the NYPD's false statement policy and practice – can be found in virtually every Annual Report issued by the Commission.

92.     Over the past ten years, in its Annual Reports, the Commission has analyzed numerous forms of false statements and has consistently found that the NYPD "fail[s] to follow its false statement policy; "fail[s] to charge the subject officer with making a false statement although such a charge appear[s] appropriate"; levies "other similar charges…to avoid the imposition of the False Statement Policy's requirement of termination"; and creatively skirts the requirement of termination without justification.  And there is no sign of

improvement.

93.     In the specific context of fabricated court documents that falsely accuse innocent people of wrongdoing, the Commission has regularly found grossly inadequate punishments, resulting in guilty officers forfeiting vacation days (usually no more than 30 days) but rarely losing their jobs.

94.     To make matters worse, the instances of false statements analyzed by the Commission is a small fraction of the total instances of false statements that occur within the NYPD.  In the 2010 Annual Report, for instance, the Commission identified only ten IAB cases that included allegations of making an official false statement.

95.     The officers who were caught fabricating statements were unlucky – they were captured on videotape, a civilian reported them, their lies were unwittingly exposed – but most dishonest police officers know the system well enough to lie and get away with it.

96.     The number of false statement cases investigated by the IAB in the specific context of court documents is a very small portion of the actual number of instances of material fabrication in court documents.

97.     Defendant City has turned a blind eye to the tens of thousands of criminal cases which are dismissed each year in the Criminal and Supreme Courts of Defendant City; has failed to study how many of those dismissals were due to baseless, fabricated charges; has failed to proactively look for patterns of fabrication and identify charges that should have never been brought.

98.     In a criminal justice system where numbers and statistics have become paramount, the inadequacy of the NYPD's supervision and discipline with respect to dishonesty in the filing of criminal charges is exacerbated by the pressure on police

officers to meet arrest quotas, or "performance goals," which pressure officers to arrest people and file charges unlawfully, a pressure not tempered by adequate safeguards that protect innocent citizens from being wrongfully arrested and charged.

99.    Because arrests are rewarded, while making false arrests and fabricating charges go largely unpunished, police officers have felt incentivized to engage in false arrests and to fabricate criminal charges.

100.    Such perverse incentives become particularly destructive in the hands of dishonest, undisciplined, unsupervised officers.

101.    Through the data cited herein along with well-publicized events (prominent civil rights lawsuits, ticket-fixing, and a secret quota system, to name a few) and other information in its possession, the policymakers of Defendant City have been aware of the NYPD's practice of insufficiently punishing – and thereby encouraging – the filing of fabricated criminal charges.  By doing nothing about this practice, the City has demonstrated deliberate indifference to the rights of its citizens.

102.    Unfortunately, under Mayor Bill de Blasio's administration, the NYPD seems more empowered than ever to thumb its nose at the False Statement Policy.

103.    In its 2015 Report, the Commission found that the Department rarely brought charges under the False Statement provision.  "Instead," the Commission writes, "the Department used other Patrol Guide sections to allege misconduct relating to false statements" (pg. 103), sections which do not carry a presumption of termination.

104.    The notion of police officers lying, cheating, fabricating, manipulating, and misleading has become so accepted and commonplace within the NYPD that the pursuit of justice, which is rooted in truth and fact, has become subverted and degraded.

105.     While most police officers are good honest people, they must operate in a police culture so truth-sick and cynical that their morale is crushed and virtue perverted, knowing that roguish behavior is rewarded while honesty is thwarted.  As a result, the safety, welfare, and liberty of every citizen are threatened.

**Damages**

106.     As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

      a.  Violation of his constitutional rights under the First and Fourth Amendments to the United States Constitution;

      b.  Economic damages resulting from stolen goods and broken items;

      c.  Severe emotional trauma, distress, degradation, and suffering.

**SECTION 1983 CLAIMS**

**FIRST CLAIM**

**Deprivation of Federal Civil Rights Under Section 1983**

107.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

108.     All of the aforementioned acts of Defendants, their agents, servants and employees, were carried out under the color of state law.

109.     All of the aforementioned acts deprived Plaintiff of the rights guaranteed to citizens of the United States by the First and Fourth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

110.    The individual defendants acted willfully, knowingly, and with the specific

intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by

the First and Fourth Amendments of the United States Constitution.

111.    As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SECOND CLAIM

### Illegal Search Under Section 1983

112.    Plaintiff realleges and reiterates all allegations set forth in the preceding

paragraphs as if stated fully herein.

113.    By the actions described, the Defendants deprived Plaintiff of his Fourth

Amendment right to be free of unreasonable or unwarranted restraints on personal liberty,

specifically his right to be free from unlawful searches.

114.    Based on a false search warrant application, the individual defendants

obtained a search warrant and searched Plaintiff's Apartment, where Plaintiff had an

expectation of privacy.

115.    As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## THIRD CLAIM

### False Arrest Under Section 1983

116.    Plaintiff realleges and reiterates all allegations set forth in the preceding

paragraphs as if stated fully herein.

117.     By the actions described above, Defendants deprived Plaintiff of his federal

civil rights, including his Fourth Amendment right to be secure in his person against

unreasonable searches and seizures, specifically his right to be free from false arrest.

118.     As detailed above, the individual defendants intentionally arrested and

detained Plaintiff without probable cause, without a warrant, without privilege or consent.

119.     As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FOURTH CLAIM

### Malicious Prosecution Under Section 1983

120.     Plaintiff realleges and reiterates all allegations set forth in the preceding

paragraphs as if stated fully herein.

121.     By the actions described, the Defendants deprived Plaintiff of his Fourth

Amendment right to be free of unreasonable or unwarranted restraints on personal liberty,

specifically his right to be free from malicious prosecution.

122.     Without probable cause, the individual defendants directly and actively

initiated a criminal proceeding against Plaintiff, creating a fraudulent theory of guilt.

123.     As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

### First Amendment Retaliation Under Section 1983

124.     Plaintiff realleges and reiterates all allegations set forth in the preceding

paragraphs as if stated fully herein.

125.     By the actions described, the individual defendants retaliated against Plaintiff because he lawfully exercised his First Amendment right to free speech.  In doing so, the individual defendants chilled Plaintiff's exercise of his right to free speech.

126.     As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SIXTH CLAIM

### Failure to Intervene Under Section 1983

127.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

128.     Each and every individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by other law enforcement officers.

129.     The individual defendants failed to intervene on Plaintiff's behalf to prevent, end, or truthfully report the violations of his constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

130.     As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SEVENTH CLAIM

### Municipal Liability Under Section 1983

131.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

132.     By the actions described, the Defendant City deprived Plaintiff of his Constitutional rights through its failure to train, supervise, and discipline mendacious and

malicious officers; and through its fostering a culture of abuse and dishonesty among those who wield considerable power over the lives of everyday citizens.

133.　　As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the other damages and injuries hereinbefore alleged.

## PENDENT STATE CLAIMS

### FIRST CLAIM

**False Imprisonment under N.Y. State Law**

134.　　Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

135.　　The individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, and without privilege or consent.

136.　　As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

### SECOND CLAIM

**Malicious Prosecution Under N.Y. State Law**

137.　　Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

138.　　As detailed above, the individual defendants intentionally and with actual malice initiated a felony prosecution against Plaintiff without probable cause.  The prosecution terminated in Plaintiff's favor when all charges against him were dismissed.

139.　　As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

### THIRD CLAIM

**Unreasonable Search and Seizure Under New York State Constitution Art. I § 12**

140.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

141.    Article 1, Section 12, of the New York State Constitution declares the right to be free from unreasonable searches and seizures.

142.    Without probable cause and without Plaintiff's consent, the individual defendants arrested Plaintiff, searched his person and home, took his property, confined him, and initiated false charges against him.

143.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FOURTH CLAIM

**Larceny Under N.Y. State Law**

144.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

145.    As detailed above, the individual defendants intentionally stole Plaintiff's property.

146.    As a direct and proximate result, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

**Trespass to Chattels**

147.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

148.     Defendants intentionally damaged and interfered with Plaintiff's use and enjoyment of property inside his Apartment.

149.     As a result of its negligent conduct, Defendant City has directly and proximately caused the damages and injuries hereinbefore alleged.

## SIXTH CLAIM

### Negligent Hiring/Training/Retention of Employment Services Under N.Y. State Law (Against Defendant City of New York)

150.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

151.     Defendant City owed a duty of care to Plaintiff to prevent the unlawful search, false arrest, malicious prosecution, and mental and emotional abuse sustained by Plaintiff.

152.     Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

153.     Defendant City knew or should have known through the exercise of reasonable diligence that the individual defendants could potentially cause harm.

154.     Defendant City's negligence in hiring, screening, training, disciplining and retaining the individual defendants proximately caused Plaintiff's injuries.

155.     As a result of its negligent conduct, Defendant City has directly and proximately caused the damages and injuries hereinbefore alleged.

## SEVENTH CLAIM

### Respondeat Superior Under N.Y. State Law

156.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

157.    Defendant City is the employer of the individual defendants.

158.    Under the doctrine of *respondeat superior*, the Defendant City is responsible for the wrongdoing of its employees acting within the scope of their employment – in this case, the false imprisonment, malicious prosecution, larceny, trespass to chattels, and unreasonable search and seizure committed by the individual defendants against Plaintiff.

159.    As a direct and proximate result of the acts of the individual defendants detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

a.    An order awarding compensatory damages for Plaintiff Hozie Rowell in an amount to be determined at trial;

b.    An order awarding punitive damages in an amount to be determined at trial;

c.    A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is entitled to reasonable attorney's fees, costs and disbursements; and

d.    Such other and further relief as this Court may deem appropriate.


DATED:    December 22, 2016          _____s/_____
          New York, New York          CYRUS JOUBIN, ESQ.
                                       43 West 43rd Street, Suite 119
                                       New York, NY 10036
                                       (703) 851-2467
                                       joubinlaw@gmail.com
                                       Attorney for Hozie Rowell